# Federal Defenders
## OF NEW YORK, INC.

One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

David Patton
*Executive Director and*
*Attorney-in-Chief*

Deirdre D. von Dornum
*Attorney-in-Charge*

December 30, 2021

<u>BY ECF</u>

The Hon. Eric Komitee
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: *United States v. Dennis Harris*, No. 21 Cr. 376 (EK)

Your Honor:

The defense respectfully submits this reply to the government's opposition to our motion to suppress.

### A. A Hearing Is Warranted

1. The government appears to have disavowed its previous assertion that the warrantless car search occurred "[a]fter the arrest" of Mr. Harris. (*See* Compl. ¶¶ 2-3; Def's Br. 2). Instead, it now concedes, at least implicitly, that the car search occurred "just prior to arrest." (Opp. 1 (relying on case law governing that factual scenario); *see also id.* at 2-3 (conceding that body camera footage shows Mr. Harris handcuffed only after the car search)).

Yet the government never admits explicitly that its previous sworn assertion was false. It also downplays the issue, arguing that isolating "a single line in the related state court complaint" merely gives "the appearance of a material factual dispute," because "the relevant events were captured on body camera footage." (Opp. 5).

These efforts at minimization cannot avoid a hearing.

For one thing, the misstatement in question was not made in the "related state court complaint." It was made in the complaint filed in this Court. Detective Debra Lawson made the following sworn statements in that document, having been made familiar with the case by her own participation in the investigation and other officers' statements: "Officers arrested the defendant for driving while intoxicated and unlawful possession of marijuana. *After the arrest*,

the officers searched the defendant's vehicle and recovered a [firearm and ammunition] from a fuse box compartment below the steering wheel." (Compl. ¶¶ 2-3 (emphasis added); *see also id.* ¶ 1 (describing Detective Lawson's participation in and familiarity with the investigation)).

It matters that, contrary to Detective Lawson's statement, the search actually occurred before the arrest. If the search had really been conducted after the arrest, the police would be able to avail themselves of well-established, and possibly dispositive, search-incident-to-arrest case law justifying their car search. (*See* Def.'s Br. 4). Now that the government has apparently foresworn Detective Lawson's narrative, it must resort to the much muddier (and unfavorable, as discussed below) doctrine governing searches that occur just prior to arrest. The timing of the arrest is therefore material.

Nor can the government duck a hearing by simply changing factual positions now that the body camera footage has come to light. At least one NYPD officer who "participat[ed] in the investigation" of this case (Compl. ¶ 1) has made a false statement under oath about a material factual issue. The defense should be permitted to determine through cross-examination why she did so and how far the falsity goes – Was it to try to sweep a troubling suppression issue under the rug? Was it merely a report of a false claim by another officer, and if so, who? To what extent is this false claim connected to other factual claims that once seemed merely dubious?

The government's attitude toward the false sworn statement by its own agent is thus both troublingly evasive and troublingly cavalier. If Mr. Harris had made a false statement in his supporting affidavit, there would be talk of obstruction, if not perjury. Yet the government now tries to sweep a similar false statement under the rug because it wants to avoid a hearing that might test the legality of the investigation it is at pains to defend. A hearing should be held for this reason alone.

2.       The government impeaches its own complaint's credibility in a second respect that also warrants exploration at a hearing. Specifically, the complaint asserts that when officers first arrived on the scene, "[a]fter placing the vehicle in park and shutting off the vehicle, the officers attempted to provide aid to the defendant, *detected an odor of alcohol coming from the defendant*, and observed marijuana and a marijuana vape pen in plain view." (Compl. ¶ 2 (emphasis added)). The officers' alleged detection of an "odor of alcohol" is material, because it is a critical piece of the alleged probable cause: it is the only evidence the arresting officers appear to have had prior to arrest that Mr. Harris at the time was affected by alcohol, as opposed to, for example, a medical condition or some other substance.

Yet the government's opposition brief retreats from the claim that officers detected an odor of alcohol on Mr. Harris before his arrest (and before the car search). It now says that observation occurred *after* the arrest, while Mr. Harris was being transported to the precinct: "The defendant was also transported to the 79th Precinct, *at which point* Officer Rodriguez smelled an odor of alcohol emanating from him." (Gov't Opp. 3 (emphasis added)). As discussed below, if *that* is the first time the police had reason to believe Mr. Harris was drunk, it is a problem for the government's claimed basis to search the car for evidence of alcohol.

Yet again, the government fails to explicitly acknowledge its about-face on a material factual position.  Instead, in a telling footnote, it tries to wave the issue away, saying that it is not sufficient for our motion to question the credibility of the claim that officers were somehow able to smell an odor of alcohol outdoors, through masks, in the audible wind.  (Gov't Opp. 3 n.2; *see* Def. Br. 3).  It argues that "statements in a motion cannot create a disputed issue of material fact," and that Mr. Harris must put the issue in dispute through his affidavit.  (Gov't Br. 3 n.2).

That can't be right.  Mr. Harris has no idea what the officers were able to smell, or not, before the search.  Nor would he be a competent witness to testify about what Officer Rodriguez could smell in the transporting car.  These facts are in the government's witnessses' knowledge, not his, and it is the government that has impeached its own witness's credibility by disavowing yet another sworn statement in its complaint.  Nothing more is required, or could be required, for a hearing on this issue.

3.        There is more.  In our opening papers, we pointed out that there was no basis in the body camera footage or any discovery produced at that point to support the complaint's allegation that officers observed, prior to the search or arrest, any marijuana beyond the single vape pen that was apparently on the floor of the driver's side compartment.  (*See* Def.'s Br. 3; Compl. ¶ 2).  To the contrary, the state court complaint made clear that a ziplock bag of marijuana—the only other marijuana found in the car—was found in a panel "in the driver's door" of the vehicle, hardly in plain view from outside the vehicle.  (Def.'s Br. DX B at 1).  After our motion was filed, the government produced for the first time vouchers showing that a small quantity of marijuana was in fact recovered in addition to the vape pen (*see* Gov't Opp. 14 n.5), but there is still no indication in the record that officers could have, or did, observe that marijuana prior to the search.

A hearing is therefore warranted to determine whether and to what extent the officers did observe the additional marijuana prior to the search, as the complaint—now fatally undermined in at least two respects by the government's own shifting position—once claimed.  Here too, the government argues that it is up to Mr. Harris to put the issue in dispute in his affidavit (*see* Gov't Opp. 3 n.2), but here too, he is not a competent witness regarding what officers observed.  It is up to the government to make clear what its shifting position will finally end up being in this proceeding, through witnesses subject to cross-examination under oath.

4.        Finally, as discussed below, the government's belated claim of inevitable discovery requires a hearing.  Beyond a few vouchers reflecting some evidence recovered from the vehicle, the government has not produced any video or testimonial evidence than an actual inventory search was conducted pursuant to the procedures set forth in the Patrol Guide, let alone that one that would have encompassed the fuse box.  Nor, given the substantial credibility issues discussed above, should the government be permitted to allege by unsworn representation that a good faith inventory search would "inevitably" have been conducted by the same officers whose credibility the government itself has called into question.

**B.      The Search Incident To Arrest Exception Does Not Apply**

1.      The government argues that the warrantless car search was lawful as a search incident to arrest because, even though the search occurred after the arrest (as the government apparently now concedes), it was nonetheless permissible because it was, allegedly, "substantially contemporaneous with the arrest and confined to the immediate vicinity of the arrest." (Gov't Opp. 7 (quoting *United States v. Diaz*, 854 F.3d 197, 205 (2d Cir. 2017)). This is mistaken. *Diaz* does not apply here, and the requirements for a valid search incident to arrest have not been met.

First, the search was not "confined to the immediate vicinity of the arrest," as *Diaz* requires. *See* 854 F.3d at 205. As the body camera footage reflects, by the time Mr. Harris was handcuffed, he was inside an ambulance two car lengths away from the car that was searched. (*See* Def. Br. 1-2 & 4). That is not "the immediate vicinity" within the meaning of *Diaz*.

The Second Circuit in *Diaz* made clear that the governmental interests at stake in that case were "protecting arresting officers and safeguarding any evidence of the offense of arrest that the arrestee might conceal or destroy." 854 F.3d at 205 (quoting *Arizona v. Gant*, 556 U.S. 332, 339 (2009)). Neither interest was implicated during the search of Mr. Harris's car, with Mr. Harris himself inside an ambulance well away from the area of the search. It was impossible for Mr. Harris to access anything in his car at such a distance, and thus there was no need to search the car to protect the arresting officers from him reaching anything inside it, or to protect any evidence from concealment or destruction.

By contrast, *Diaz* and the other case cited by the government both involved searches far more proximate than the one here. Indeed, they both involved a search of a defendant's *person* immediately before his arrest on the spot—it is hard to conceive of a closer "vicinity" to the area of arrest. *See* 854 F.3d at 200-01 (search of defendant's jacket pocket following a frisk); *see also Evans v. Solomon*, 681 F. Supp. 2d 233, 248 (E.D.N.Y. 2010) (search of defendant's pocket).

The difference between *Diaz*, on the one hand, and this case, on the other, arises from well-established Supreme Court precedent. The Supreme Court in *Gant* held that the governmental interests authorizing searches incident to arrest are not implicated, and thus the exception does not apply, when, as here, the defendant "could not have accessed his vehicle at the time of the search." 556 U.S. at 344-45. Nothing in *Diaz* changed, or could have changed, this governing principle—the search of Mr. Harris's car was therefore not "confined to the immediate vicinity" of the arrest in the relevant respect.

*Diaz* therefore is not applicable to the warrantless search of Mr. Harris's car.

2.      Curiously, the government appears to recognize this, conceding that "the defendant could not reach [the car's fuse box] at the time" of his arrest (Gov't Opp. 10), although it fails to acknowledge the logical consequence of its concession. Instead, the government shifts its focus to the second prong of *Gant*, arguing that the search incident to arrest exception applies because, in light of the officers' alleged probable cause to arrest Mr. Harris for DWI and

unlawful marijuana possession, it was *ipso facto* "reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." (*Id.* at 10-11).

We have already explained the fatal flaws in this reasoning (Def.'s Br. 3 & 5-6)—the same flaws are present in the government's analysis of the automobile exception, which we address next. The relevant point for now is that the government fails to establish that *Gant* applies in the first place. Rather, the fact that Mr. Harris was arrested only after the search, plus the fact that he was not in "the immediate vicinity" of the car when it was searched and he was arrested, mean that *Diaz*, *Gant*, and the search-incident-to-arrest doctrine do not apply here.

## C.      The Automobile Exception Does Not Apply

1.      The government argues the automobile exception (and the second prong of *Gant*) justify the warrantless car search because officers "observed the defendant's clearly intoxicated state," and the "cause of intoxication (e.g., alcohol, drugs, etc.)" was "still under investigation." (Gov't Opp. 11 & 13-14). But as we have explained, the notion that DWI arrests inherently authorize a full car search was comprehensively considered and rejected in *United States v. Taylor*, 49 A.3d 818 (D.C. App. 2012), the most scholarly and thoughtful decision we have found on the topic. (*See* Def.'s Br. 5).

Bizarrely, the government dismisses *Taylor* because it considered the question under the lesser standard of "reasonable suspicion." (Gov't Br. 13). Yet the logic of *Taylor* applies *a fortiori* to the more stringent probable cause standard required for the automobile exception. Besides, the government nowhere comes to grips with the substance of *Taylor*'s analysis: when there is no factual basis to conclude a defendant had been drinking in a vehicle (like a visible open container, or even a closed container), there is, at bottom, no more than a mere possibility of finding evidence of that drinking in the car. That is not enough even for reasonable suspicion, let alone probable cause.

2.      The government's dismissal of *Taylor* is of a piece with its muddled reasoning generally with respect to the automobile exception. For example, the government further confuses matters by collapsing the analysis of the automobile exception—which it acknowledges requires probable cause—with the second prong of *Gant*—which it acknowledges requires some lesser standard—but it then proceeds to apply the lesser *Gant* standard to the facts of this case under the guise of analyzing the automobile exception. (*See* Gov't Br. 12-13).

Fortunately, there is no need for the Court to disentangle this confusion. As we have already explained, *Gant* and its lesser standard is not applicable here, so there is no need to address the differing "categorical" or "articulable suspicion" approaches to that standard. The only relevant standard is probable cause, and none of the government's cited cases say that probable cause to arrest for a DWI offense automatically yields probable cause to search a car for further evidence of that offense.[1]

---

[1] In any event, the second prong of *Gant* would not justify the search here. *Taylor* explains why the categorical approach is incorrect, and there were no additional factors beyond what had left

Indeed, the government's authority supports the defense position. For example, in *United States v. Lopez*, upon which the government heavily relies, the court found that probable cause to arrest a defendant for a DUI offense—based on an open container in the car, the defendant's admission to drinking, nervous conduct, and field sobriety tests, among other things—did *not* yield probable cause to search the defendant's car for contraband. *See* 2019 WL 7838283, at *6 (D. Mont. Dec. 18, 2019) (The arresting officer "said he searched the vehicle based solely on the fact that Lopez had been arrested for DUI. Thus, *the search is not valid under the automobile exception* to the warrant requirement, which requires that police have probable cause to believe the vehicle contains contraband." (emphasis added)). Instead, *Lopez* upheld the search based on *Gant*, which, as we have explained, does not apply in this case.

3.     *Lopez* also puts to rest the government's alternative argument that a search was warranted because officers did not conclusively know which substance, if any, Mr. Harris was under the influence of. (*See* Gov't Opp. 14-15). In *Lopez*, too, the investigating officer did not know whether the defendant, who was clearly under the influence of something based on field sobriety tests, was under the influence of alcohol or drugs—the defendant said he had consumed alcohol, but a field test showed zero blood alcohol content, and the officer had historical reasons to suspect the car had drugs. Yet still, the court found there was no probable cause to search the car. *See id.* at *6. (The government misleadingly quotes *Lopez* for the proposition that "there was probable cause to believe [the defendant] was intoxicated on a controlled substance" (Gov't Opp. 15), but that was probable cause to *arrest*, not to search the car).

In any event, the government's evolved position on when officers detected any evidence of alcohol implies that their purported suspicion of a "combination of DWI and possession of marijuana" (Gov't Opp. 14) actually did not involve suspicion of alcohol at all, and was solely focused on marijuana. If, as discussed above, the government's opposition papers are correct that officers did not detect any odor of alcohol on Mr. Harris until after the search and arrest, and the sworn complaint is wrong that alcohol was detected beforehand, then there was zero evidentiary basis for the officers to believe that Mr. Harris's incapacity could be attributed to alcohol, as opposed to a medical condition or marijuana. Accordingly, to the extent the government does want to rely upon evidence of alcohol to support the car search, a hearing is necessary.

4.     A hearing is necessary in any event to determine what quantity of marijuana the officers could have reasonably observed before the search. We have already demonstrated that a vape pen alone was not enough at the time to warrant a search based on probable cause for a *criminal* amount of marijuana. (*See* Def.'s Br. 3 & 5-6 (discussing then-existing N.Y. Penal Law 221.05, which made possession of personal use marijuana a non-criminal violation)). As discussed above, if the government wants to try to justify the search based on the additional marijuana found in the driver's side door panel, a hearing is warranted to determine if it was visible to the officers before the search. (Even so, it is not clear that such an additional quantity would have indicated more than personal use in any event.)

the car in Mr. Harris's body that would justify a search of the car for more evidence. (*See* Def.'s Br. 5).

5.      The government's response to this argument is nothing more than a jumble of irrelevancies.  For example, the government argues that "[d]riving while intoxicated by drugs or alcohol and possession of marijuana are precisely the types of crimes that inherently provide probable cause to search for evidence of those crimes," but as discussed above, the only authorities it cites are about searches incident to arrest under the lesser *Gant* standard, which we have already demonstrated does not apply.  (*See* Gov't Opp. 13-14).  Moreover, as we have just explained, the *Lopez* case actually supports the defense position on this question.

Nor are we relying on the fact that marijuana was legalized following Mr. Harris's arrest, as the government implies we are.  (*See* Gov't Opp. 15).  The point is not that marijuana was *legal* at the time, it is that possession of personal use marijuana was not a *criminal offense*.  Nor is it remotely the point that officers had the power to arrest Mr. Harris for that non-criminal offense.  (*See id.*).  The question is whether they had the power to *search the car* for evidence of something that was, under New York law, not "criminal activity."  *See United States v. Ross*, 456 U.S. 798, 820-21 (1982) (search under automobile exception requires "probable cause to believe [the] vehicle contains evidence of criminal activity").

But the main problem with the government's response is that it has nothing to offer about the larger issue, which is that authorizing a full car search based on a non-criminal amount of marijuana—as it invites the Court to do—is akin to authorizing a full car search based on "a traffic offense," which the Supreme Court has warned would "create[] a serious and recurring threat to the privacy of countless individuals."  *Gant*, 556 U.S. at 344-45.  That threat, too, is the motivator of the decisions we have cited prohibiting car searches in the contexts where marijuana has been decriminalized in other states.  (*See* Def's Br. 5-6).  The Court should follow those authorities, and the Supreme Court's concern in *Gant*, and decline to authorize the warrantless car search based on non-criminal marijuana in this case.

### D.      The Inevitable Discovery Exception Does Not Apply

The government argues that any illegal fruits of the warrantless search "would have been inevitably discovered during an inventory search of the car."  (Gov't Br. 18).  It principally relies upon Judge Garaufis's decision in *United States v. Sha-Ken Miller*, No. 18-CR-395 (NGG), 2019 WL 2088248 (E.D.N.Y. May 13 2019), which ruled that an NYPD officer's decision to search the fuse box of a car, in which a firearm was discovered, "was a permissible inventory search." *Id.* at *6.  (*See* Gov't Br. 19 (citing also *United States v. Zimmerman*, 480 F. Supp. 3d 446 (E.D.N.Y. 2020), which also relies upon *Sha-Ken Miller*)).  This argument fails on two grounds.

1.      First, what the government fails to say about *Sha-Ken Miller* is that Judge Garaufis ultimately granted a suppression hearing in the same case; in a published decision found the testifying officers had been "less than candid on direct examination;" and suppressed the firearm in question.  *See United States v. Sha-Ken Miller*, 439 F. Supp. 3d 91, 99 (E.D.N.Y. 2020).  The same discredited officer's previous narrative about his inventory search in the same case is a disreputable basis for future decisions.

For example, the defense had argued to Judge Garaufis prior to the hearing in *Sha-Ken Miller* that the police narrative about the inventory search should be doubted, because their statements and behaviors during the videotaped search appeared "performative," *i.e.*, they led to an inference that the gun had been discovered previously, and the video was merely a bad-faith performance of a purportedly neutral inventory search. *See* 2019 WL 2088248, at \*6. Before the searching officer's testimony was put to the test at a hearing, Judge Garaufis dismissed those doubts. *Id.* Now that the officer's testimony has been found to be "less than candid," however, it is not proper for the government to ask this Court to rely upon the purported legality of an inventory search based on that officer's account, particularly without giving Court all the facts to make its own decision.

In this case, too, the fact that the government's own sworn complaint has been called into question in multiple respects means that the Court should not blindly accept, without even a hearing, the government's unsworn representation that an inventory search would have been conducted here in good faith pursuant to the Patrol Guide. Rather, as in *Sha-Ken Miller*, the fact that officer credibility has now been called into question similarly puts into question the officers' representation that a good-faith search would "inevitably" have occurred, rather than what appears to have happened in *Sha-Ken Miller*, *i.e.* officers so determined to search a car without a warrant and without legal basis would simply have used the inventory search as a pretext to gather evidence, and not "in good faith pursuant to standardized criteria or established routine." *See United States v. Morillo*, No. 08 CR 676(NGG), 2009 WL 3254431, at \*8 (E.D.N.Y. Oct. 9, 2009).

2.      Moreover, the defense view is that the legal position of *Sha-Ken Miller* (and *Zimmerman*, which relies on *Miller*) is incorrect—the search of a car's fuse box exceeds the scope of a permissible inventory search.

First, courts have routinely rejected police searches of similar interior car panels under the guise of "inventory searches." They have held that, "[a]lthough the permissible scope of an inventory search has not been well-defined, searching behind the door panel of a vehicle does not qualify as standard police procedure, and does not serve the purpose of protecting the car and its contents under any normal construction of those terms." *United States v. Best,* 135 F.3d 1223, 1225 (8th Cir. 1998) (quoting *United States v. Lugo*, 978 F.2d 631, 637 (10th Cir. 1992)) (internal quotation marks omitted); *see also United States v. Torbert*, 207 F. Supp. 3d 808, 823-24 (S.D. Ohio 2016) (finding that removal of interior car paneling by driver's-side leg area "far exceeded the scope of a permissible inventory search").

Accordingly, the government cannot establish that the search here was conducted "pursuant to standardized criteria or established routine" by the NYPD. *Morillo*, 2009 WL 3254431, at \*8. Indeed, in the State of New York, where this issue comes up frequently, courts routinely hold that warrantless searches of fuse boxes and interior car panels are not justified as inventory searches. *See, e.g.*, *New York v. Gomez*, 13 N.Y.3d 6, 11 (2009) (finding "no evidence" that police search of door panel was conducted "in accordance with the protocol" governing NYPD inventory searches, or "the circumstances under which opening and searching . . . a door panel would be justified under the protocol"); *New York v. Lamb*, 862 N.Y.S. 2d 810, 9

Misc.3d 1120(A) (Sup Ct. Oct. 20, 2005) (seizure of "a loaded pistol" found "secreted in a fuse box located on the driver's side of the vehicle" held unreasonable as an inventory search).

In light of these decisions, it is unsurprising that the portion of the Patrol Guide that the government proffers does not cover fuse boxes, or any car panels for that matter. Rather, it says that the search of the interior of the vehicle "should include any area that may contain valuables," and goes on to list places where valuables might be stored (like the glove compartment), put down briefly (like the area around the seats and ashtrays) or accidentally lost (like in the accessible air vents or under floor mats). Nowhere does the chapter authorize the police to open fuse boxes, or any similar utility or door panels, for the simple reason that those are not areas that would contain valuables. Notably, the opinion in *Sha-Ken Miller* does not address this point.

Nor does it make any difference that the fuse box panel in *Sha-Ken Miller*, for example, "was designed to and did open easily by hand." 2019 WL 2088248, at *6. "[A] skewed interior panel—notably one in the passenger's leg area, which has undoubtedly been kicked or bumped over time—is more likely to be an indication of vehicular damage than a compartment for storing personal property." *United States v. Torbert*, 2017 F. Supp. 3d 808, 824 (S.D. Ohio 2016). "Thus, an officer conducting an inventory in good faith would be more careful not to cause further damage by . . . causing it to 'pop right off,' easily or not." *Id.*

3.      Finally, even if the Court adopts the legal view of *Sha-Ken Miller*, there remain factual issues to resolve at a hearing. For example, unlike in *Sha-Ken Miller* and *Zimmerman*, there is no videotape of any inventory search in the record here, or any testimony that the inventory of the car was faithfully catalogued pursuant to the procedures set forth in the Patrol Guide. Nor has the government established that any such inventory source would "inevitably" have extended to the car's fuse box—there is zero record basis for such a conclusion, and the fact that the Patrol Guide chapter proffered by the government does not mention fuse boxes lends reason to doubt that it would have occurred "inevitably."

Particularly given the doubts about the government's police witnesses' credibility already discussed, we urge the Court not to accept the government's conclusory assurance that a good-faith inventory search would inevitably discovered the firearm in question.

*       *       *

For the reasons set forth above and in our initial moving papers, the warrantless search of Mr. Harris's car violated the Fourth Amendment.  The fruits of that search, including the firearm, marijuana, and statements, should be suppressed.  In the alternative, the Court should hold a suppression hearing.

Respectfully submitted,

/s James Darrow

James Darrow
Assistant Federal Defender
Tel. (718) 407-7419
james_darrow@fd.org

*Attorneys for Dennis Harris*

cc:     Counsel of record (by ECF)
        Chambers of the Hon. Eric Komitee (by email)