UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x

UNITED STATES OF AMERICA

            -against-                    **MEMORANDUM & ORDER**
                                 21-CR-376(EK)

DENNIS HARRIS,

              Defendant.

------------------------------------x
ERIC KOMITEE, United States District Judge:

      Defendant Dennis Harris is charged with violating the
felon-in-possession statute, 18 U.S.C. § 922(g).  He argues that
the search that led to the discovery of the gun at issue
violated the Fourth Amendment.  Harris now moves to suppress the
gun as well as other evidence resulting from that search.  The
Court held a suppression hearing on August 2, 2022.  *See* Tr. of
August 2, 2022 Suppression Hr'g ("Tr."), ECF No. 48.  For the
reasons set forth below, Harris's motion is denied.

## I.  Background

      The government called one witness at the hearing:
Officer Benjamin Rodriguez of the New York City Police
Department.  Rodriguez's testimony and the government's physical
evidence established the following.  On the afternoon of March
14, 2021, NYPD officers responded to reports that a blue sedan
was at a standstill on Fulton Street in Brooklyn.  Tr. 9:17–
10:21.  Because Fulton Street has only one lane of traffic in

each direction at that location, vehicles approaching behind the sedan had to maneuver into the lane of oncoming traffic to get around the sedan.  Tr. 85:16–86:14.

As Officer Rodriguez approached the sedan with two other officers, he saw Harris "sleeping" behind the wheel.  Tr. 11:16–18.  The officers gave verbal commands, such as "Sir, are you okay?" and "What's going on?"; Harris did not respond.  Tr. 11:22–12:1.  Noting that the sedan's engine was running and the transmission was in the "drive" position, Rodriguez reached through the open driver's side window and across Harris to the center console, put the vehicle into park, and removed the keys from the ignition.  Tr. 12:2–13, 13:10–13.  These maneuvers did not wake Harris.  Tr. 12:14–15.

Rodriguez then opened the driver's side door and shook Harris.  Tr. 13:3–5.  When this did not work, he "applied four knuckles onto [Harris's] chest and began to rub it," upon which Harris gained consciousness.  Tr. 13:4–7.  Rodriguez's supervisor asked Harris to exit the vehicle, which he did without assistance.  Tr. 13:17–23.  Rodriguez observed Harris to be "tired" and "slurring his speech," with "watery" and "red" eyes.  Tr. 13:24–14:5.

After Harris exited the sedan, but before he closed the door, Rodriguez saw (from about three feet away) "a plastic bag containing marijuana on the door panel, the driver's side,"

"in the center of the door" where the door handle and electronic window controls are located.  Tr. 15:2–11, 16:10–12, 26:22–27:20.  Rodriguez testified that the bag could be seen in footage from Sergeant Lopez's body-worn camera.  On video, the bag appears as a white, opaque object in the door panel.  Tr. 45:7–47:20, 68:9–70:16; Gov't Ex. 2, at 0:00 to 0:02.  In reality, it is a clear plastic bag containing marijuana, tied into a knot at the top.  Tr. 44:23–45:2, 72:2–73:2.

Harris then closed the car door.  Gov't Ex. 2, at 0:02 to 0:04.  Rodriguez saw through the still-open window "a marijuana oil pen on the floor mat of the driver's side of the vehicle."  Tr. 15:12–21, 27:21–28:5.  The pen was located on the floor, on top of a brown napkin, near the center tunnel; its location is shown in a still image from Rodriguez's body camera footage.  *See* Gov't Ex. 1-A; Tr. 18:2–10, 23:11–25, 50:5–13. (As discussed below, Harris argues that Rodriguez's testimony as to when he first saw these marijuana-related items contradicted his grand jury testimony.)

Accompanied by multiple officers, Harris then walked to a nearby ambulance that had arrived.  Tr. 16:13–20. Meanwhile, Rodriguez searched Harris's sedan; while searching in the driver's area, he opened a fuse compartment located near the steering wheel and saw a silver firearm.  Tr. 28:21–29:1. Photographs of the driver's side dashboard, with the exterior

and interior of the fuse compartment visible, were admitted into evidence.  *See* Gov't Exs. 3, 4; Tr. 29:4-20, 30:14-31:3.

Rodriguez then signaled for other officers to arrest Harris.  Tr. 29:1-3.  After Harris's arrest, the NYPD towed his sedan to the precinct, where Rodriguez and other officers inventoried it later that day.  Tr. 39:4-17.  During the inventory search, Rodriguez recovered the bag of marijuana and vape pen that he previously saw in the sedan.  Tr. 40:17-41:11.

## II.  Discussion

The search of Harris's sedan was permitted under the Fourth Amendment, despite the officers' not having obtained a warrant, on two separate bases: the automobile exception to the warrant requirement, and the inevitable discovery doctrine.

## A.  Automobile Exception

The automobile exception to the warrant requirement permits officers to "conduct a warrantless search of a vehicle if they have probable cause to believe it contains contraband or other evidence of a crime."  *United States v. Wilson*, 699 F.3d 235, 245 (2d Cir. 2012).[1]  Probable cause requires only a "fair probability" that evidence of a relevant violation will be found in the place to be searched.  *Illinois v. Gates*, 462 U.S. 213,

---

[1] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

238 (1983).  When the exception applies, officers may search any area of the vehicle in which they have "probable cause to believe contraband or evidence is contained."  *California v. Acevedo*, 500 U.S. 565, 580 (1991); *see also United States v. Ross*, 456 U.S. 798, 825 (1982) ("If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search.").

1.   The Officers Had Probable Cause to Arrest Harris

Officer Rodriguez testified that, prior to searching the fuse box that contained the gun, he had observed the following: Harris sleeping (or passed out) in a car, with the engine running, in the midst of an active roadway.  Moreover, as he reached across Harris's chest to secure the transmission in "Park" and remove the keys from the ignition, Rodriguez smelled alcohol on Harris's breath.[2]  Despite this action, Harris

---

[2] One might reasonably ask whether Rodriguez's act of reaching through the car window to put the car in Park and remove the keys was a Fourth Amendment event.  Several courts have suggested that it does not.  *E.g.*, *United States v. Townsend*, 206 F. App'x 444, 449 (6th Cir. 2006) ("[S]eizure of the car keys from the ignition was a minimal intrusion, a reasonable and prudent safety precaution.  Because [the defendant] [was asleep and] had not responded to verbal inquiry, the nature of his condition was unknown to the officers and they could not know how he would react when he awoke."); *United States v. Huff*, No. CRIM.A. 11-20111-01, 2013 WL 66032, at *3 (D. Kan. Jan. 4, 2013) ("Because Officer Lancaster reasonably believed that defendant might try to drive away, he opened the passenger door, leaned into the car and removed the keys from the ignition.  Considering the totality of the circumstances, the Court concludes that Officer Lancaster's decision to remove the keys was reasonably necessary to secure officer safety and assume unquestioned command of the situation."), *modified on other grounds on*

remained non-responsive.  As discussed below, I credit Rodriguez's testimony regarding these events.  And these observations amounted to probable cause *even before* Rodriguez observed the loose marijuana in the door panel and the vape pen on the driver-side floor.  Rodriguez's observation of those items — in plain view, through the open car door and window, respectively — only buttressed that cause.  Accordingly, Rodriguez was justified in his belief that the fuse box drawer might contain additional evidence of criminality — specifically, driving under the influence.

The Seventh Circuit addressed a similar situation in *United States v. Paige*, 870 F.3d 693 (7th Cir. 2017).  In *Paige*, the defendant had fallen asleep in the driver's seat of his vehicle, which had been parked in the drive-through lane of an open McDonald's restaurant for an hour and which prompted an employee to call 911.  *Id.* at 696.  After a responding fire

---

*reconsideration*, No. CRIM.A. 11-20111-01, 2013 WL 441063 (D. Kan. Feb. 5, 2013), *aff'd*, 782 F.3d 1221 (10th Cir. 2015).

Even if Rodriguez's removal of the keys did amount to a search and seizure, no warrant was required: the act was justified under the emergency-aid exception to the warrant requirement.  *See, e.g.*, *Batt v. Buccilli*, 725 F. App'x 23, 25–26 (2d Cir. 2018) (warrantless search valid under emergency aid exception where an individual "needed medical assistance" or "could [have been] in danger"); *United States v. Kelly*, 267 F. Supp. 2d 5, 8–9 (D.D.C. 2003) (no Fourth Amendment violation where officer entered car "to assist [the defendant], who was in obvious distress," having been involved in a car crash).  *See generally United States v. Toussaint*, 838 F.3d 503, 508 (5th Cir. 2016) ("[A] person's privacy interest in his or her vehicle is less substantial than is the interest in one's house.  Forcing officers to ignore other evidence when they stop vehicles to render emergency aid would not meet the needs of law enforcement or the demands of public safety.").

captain roused the defendant, a police officer detected a

"strong odor of fresh marijuana" when she approached him.  *Id.*

at 697.  She also "observ[ed] a bottle of alcohol on the

driver's seat" of the defendant's car.  *Id.*  The officer

testified that the defendant "appeared sleepy, keeping his eyes

low and walking slowly."  *Id.*  The Seventh Circuit held that the

officer's subsequent search of the vehicle was justified under

the automobile exception because she "certainly had a reasonable

basis for believing that the vehicle contained evidence of the

offenses of arrest" — namely, "marijuana possession and impaired

driving."  *Id.* at 702.

        The same is true here.  The facts show that there was

at least a fair probability that the officers would find

evidence that Harris was driving under the influence of alcohol

or drugs or was in unlawful possession of marijuana.  It is

undisputed that Harris was sleeping (or unconscious) behind the

wheel of a vehicle stopped in the middle of an active roadway,

that a baggie of marijuana and a marijuana vape pen were in

plain view in the car, and that Harris did not respond to the

officers' questions or even rouse when Rodriguez "shook" him.

Tr. 11:16–12:18; 15:2–16:12, 26:12–28:5.  While reaching into

the sedan to turn it off, Rodriguez also smelled the odor of an

alcoholic beverage coming from Harris.  Tr. 76:17–18.  That

observation was later corroborated by a breath analysis test, which indicated a BAC of 0.166.  Gov't Ex. 5; Tr. 33:1–34:19.[3]

The Second Circuit has, not surprisingly, held a similar state of affairs to suggest probable cause to believe a person has been driving under the influence.  *See Oquendo v. City of New York*, 774 F. App'x 703, 705 (2d Cir. 2019) (probable cause existed to support arrest for driving while intoxicated where driver "had fallen asleep while his vehicle remained in drive in a traffic lane after attending a party in the early morning hours," his eyes were watery, and "there was an open, half-full bottle of beer in the car's center console"); *United States v. Guy*, 1 F. App'x 410, 411, 413 (6th Cir. 2001) (warrantless search justified under the automobile exception where officers "found [the defendant] asleep with a crank pipe in his hands" in a "'pull-off' area on the side of the road" because "the officers had probable cause to believe that contraband would be found in [the defendant's] car").[4]

---

[3] As discussed below, Rodriguez's reaching into the sedan did not violate the Fourth Amendment because it did not constitute a search, and even if it did, the search was justified under the "emergency aid" exception.

[4] *Cf. United States v. Hylton*, No. 2:17-CR-86, 2017 WL 6521322, at *6 (D. Nev. Nov. 15, 2017) (finding probable cause where defendant was "asleep in a running vehicle in the middle of an intersection; he was dazed and confused when he awoke; and he failed several steps of the Field Sobriety Tests," and officers detected a "strong odor of marijuana" coming from the vehicle), *report and recommendation adopted,* No. 2:17-CR-86, 2017 WL 6520915 (D. Nev. Dec. 20, 2017), *aff'd,* 30 F.4th 842 (9th Cir. 2022), *petition for cert. docketed*, No. 22-5741 (U.S. Oct 03, 2022); *United States v. Guy*, 1 F. App'x 410, 413 (6th Cir. 2001) ("Wampler first found Guy asleep with a crank pipe in his hands.  The officers then arrested Guy for possession of the pipe

In this case, there was more: When Harris exited the
vehicle, his speech was slurred, and he had bloodshot, watery
eyes.  Both a vape pen and a bag of marijuana were in plain view
in the vicinity of the driver's seat.  Taken together, these
facts easily establish probable cause to believe that additional
"evidence of criminal activity," *i.e.* driving while under the
influence of alcohol or drugs, would be found within the
vehicle.  *Paige*, 870 F.3d at 702; *see also, e.g.*, *Ross*, 456 U.S.
at 825; *Acevedo*, 500 U.S. at 580; *United States v. Navas*, 597
F.3d 492, 497 (2d Cir. 2010).  Thus, the search fell within the
automobile exception.

2.    Rodriguez's Alleged Inconsistencies Do Not Vitiate the
      Probable Cause

During the suppression hearing, Harris argued that I
should find Rodriguez's testimony either "not credible" or "so
equivocal that it's not possible for the government to meet its
burden" of proving beyond a preponderance of the evidence that
the search happened under lawful circumstances.  Tr. 92:17–93:6;
*see United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974)
("[T]he controlling burden of proof at suppression hearings
should impose no greater burden than proof by a preponderance of
the evidence.").  In support of this argument, Harris points to

---

and Driving Under the Influence.  As a result, the officers had probable
cause to believe that contraband would be found in his car.")

two claimed inconsistencies between Rodriguez's testimony at the hearing, on the one hand, and his testimony before the grand jury and the state-court complaint he filed, on the other. Harris also argues that Rodriguez could not have seen marijuana through the plastic bag that held it.  Tr. 105:5–106:2.  I discuss each of these arguments in turn.

      a.   Rodriguez's Grand Jury Testimony: Timeline

      The first alleged inconsistency relates to the timing of when Rodriguez first saw the two marijuana items in Harris's car.  At the hearing, Rodriguez testified that he first observed marijuana in Harris's sedan — both the vape pen and the plastic bag — after Harris got out of the car, as described in the background section above.  *See* Tr. 14:24–15:6; 60:8–17. Rodriguez presented as credible throughout his testimony; perhaps more importantly, this testimony was corroborated by Sergeant Lopez's body camera footage, which shows Harris exiting the vehicle while Rodriguez stood very close to the vehicle, in a position to see the door panel.  *Compare* Tr. 21:22–22:1, 26:22–27:6, *with* Gov't Ex. 2, at 0:00 to 0:02.  After Harris closes the door, the footage shows Rodriguez peering into the open window with his flashlight, at a natural angle to see the vape pen in its undisputed location.  *Compare* Tr. 27:6–10, 27:21–28:5, *with* Gov't Ex. 2, at 0:14 to 0:20.

However, at the hearing, defense counsel invoked

Rodriguez's grand jury testimony:

Q: What happened when you arrived?

A: We stopped the vehicle.  We approached the blue
   sedan and we began to give verbal commands.

Q: What were those commands?

A: Sir, may you -- sir, what's going on?

Q: How did he respond?

A: He did not respond.

Q: What did you do next?

A: I then put the vehicle into park and
removed the keys from the ignition.

Q: Did you smell anything as you opened the vehicle?

A: Yes.

Q: What did you smell?

A: I smelled the odor of alcohol.

Q: Where was the odor of alcohol coming from?

A: Eliminated from the defendant's breath.

*Q: Did you observe anything inside the vehicle?*

*A: Yes.*

*Q: What did you observe?*

*A: I observed a Ziploc containing marijuana on the
   door panel of the driver's side of the vehicle.  I
   also observed the marijuana oil pen on the floor
   mat of the vehicle.*

Q: What did you with the defendant next?

> A: I dispatched EMS to the scene and I asked the
>    defendant to step out of the vehicle.

Tr. 62:13-63:19 (emphasis added).

At the hearing, Rodriguez reaffirmed that he gave this testimony and that it was accurate and truthful.  Tr. 63:21-64:11.  Harris argues that this testimony should be read in chronological order and that, so viewed, Rodriguez should be understood to have testified to the grand jury that he first saw the marijuana when he reached into the car to turn it off.  Tr. 94:22-96:16.  That would be inconsistent with his hearing testimony that he only saw the marijuana once Harris exited the car.

But viewed in context, the grand jury testimony is better understood to reflect that the questioning proceeded without a precise focus on the timeline.  Rodriguez did not affirmatively testify that he saw the marijuana-containing items *when he reached in* to turn off the car; rather, he discussed observing those items in response to a question by the prosecutor that was about those items specifically.  Direct examination is a combined effort at storytelling by two partners — questioner and witness.  Because the lawyer frames the questions, it can be difficult for the witness to ensure that the testimony unfolds in strict chronological order.  *See generally* Richard B. Klein & Roberto Aron, *Trial Communication*

*Skills* § 22:2 (2d ed.) ("In direct examination, the dialogue develops in terms of questions and answers; the theme is established by the lawyer, and the witness must answer, without changing the subject of the question."), Westlaw (Nov. 2021 Update).  And "minor gaps in the record do not undermine [the] conclusion that the officer[] testified credibly." *United States v. Cancel*, 167 F. Supp. 3d 584, 590 (S.D.N.Y. 2016). Here, the testimony and body camera footage, taken together, make clear that Rodriguez testified credibly concerning the order of events (an order that Harris does not affirmatively dispute).

      b.   The "Ziploc" Bag Testimony

      The second claimed inconsistency relates to the type of plastic bag that contained the marijuana.  In his grand jury testimony and the state-court complaint that he swore, Rodriguez identified the bag as a "Ziploc" bag.  Tr. 63:11–14, 75:19–76:12; State-Court Complaint 1 ("[T]he deponent did observe one (1) cannabidiol vape pen on the floor in front of the driver's seat of seat vehicle and one (1) ziplock bag containing marihuana in the driver's door of said vehicle."), ECF No. 14-2. At the hearing, Rodriguez testified that the bag was knotted at the top, not "zip-locked."  Tr. 72:6–18.  The government introduced the bag into evidence, and it was indeed knotted. Tr. 106:24–107:14.  But this difference in terminology is

immaterial: Rodriguez's use of the name "Ziploc" can easily be understood to refer to the category of plastic, sandwich-sized bags rather than any particular brand, much like people use "Q-tips" to describe cotton swabs in common parlance, and "Band-Aids" for adhesive bandages.

       c.   Rodriguez's Ability to See the Bag's Contents

Harris also asks the Court to reject Rodriguez's testimony that he could see through the bag to its contents while it was in the door panel. Tr. 48:3–30. This testimony, Harris claims, is belied by the body camera footage in which the bag appears as a small white (rather than clear) mass. Tr. 92:10–93:1. But it should go without saying that objects do not always appear on video as they do to the naked eye, and that this is especially true when the camera and the naked eye are observing from different vantage points. Here, the body camera footage that Harris invokes is from Sergeant Lopez's camera, not Rodriguez's. It shows Rodriguez looking at the bag from a position right next to the driver's door; Sergeant Lopez is standing near the rear of the car, at a considerably farther distance. *See generally* Seth W. Stoughton, *Police Body-Worn Cameras*, 96 N.C. L. Rev. 1363, 1402–05 (2018) (discussing the limitations of body-worn cameras, including effects of image compression).

In any event, the quality of Rodriguez's visibility into the marijuana bag is academic in the probable-cause analysis.  Harris does not meaningfully dispute Rodriguez's testimony that could see the vape pen and identify it as containing marijuana, and one example of contraband is enough. For that matter, it is also undisputed that the officers discovered Harris asleep (or unconscious) behind the wheel in an active roadway, smelling of alcohol, and that he did not awaken even after police shouted commands at him and physically shook him.  These indications provided sufficient cause to search the sedan, even in the total absence of the plastic bag.

3.   Probable Cause For a "Violation" Was Sufficient

Harris argues that the suspected marijuana possession at issue here did not rise to the level of "criminal activity" because it was punishable only by a fine.  Def. Letter in Supp. of Mot. to Suppress 5-6; *see Arizona v. Gant*, 556 U.S. 332, 347 (2009).  This argument fails for two reasons.  First, it is well established that police officers may effectuate an arrest even for a violation.  *See, e.g.*, *Atwater v. City of Lago Vista*, 532 U.S. 318, 345–55 (2001); *Kee v. City of New York*, 12 F.4th 150, 159–60 (2d Cir. 2021).  Similarly, the automobile exception permits the warrantless search of a vehicle even in pursuit of evidence of a violation.  *See Gant*, 556 U.S. at 343–44. Marijuana possession remained a violation under New York law at

15

the time the search here was effectuated (and for approximately two weeks thereafter). *See* N.Y. Penal Law § 221.05 (repealed effective Mar. 31, 2021); *see also* N.Y. Crim. Proc. Law § 140.10(1)(a); N.Y. Penal Law § 10.00(1). Thus, just as Harris could be arrested based on probable cause that he had committed a violation, his vehicle could be searched based on probable cause that it contained additional evidence of that violation.

Second, *driving* while under the influence of marijuana of course remained, at all relevant times, a crime. *See* N.Y. Veh. & Traf. Law § 1192(4). And the facts established at the hearing show that the officers had ample cause to think that evidence of that offense, such as additional marijuana, could be contained in the vehicle. *Cf. United States v. Carter*, 173 F. App'x 79, 81 (2d Cir. 2006) (holding that "the fact that a marijuana cigarette was seen in the open ashtray . . . gave rise to a fair probability that contraband or evidence of a crime would be found" elsewhere in the vehicle); *United States v. Vereen*, No. 20-CR-566, 2021 WL 3771989, at *6 (S.D.N.Y. Aug. 23, 2021) ("[W]hen a search is justified by the odor of marijuana and the officer then finds some amount of marijuana, it would be reasonable for him to conclude that, if he continues to search, there is a 'fair probability' that he will find more.").[5]

---

[5] Harris does not argue that the officers violated the Fourth Amendment when they asked him to exit the vehicle. And in any event, the officers were

Thus, Rodriguez's search of Harris's sedan was justified under the automobile exception.

**B.   Inevitable Discovery Doctrine**

Even if the automobile exception did not apply, Rodriguez's search of the fuse box was justified by the doctrine of inevitable discovery.  Under that doctrine, "evidence that was illegally obtained will not be suppressed if the government can prove that the evidence would have been obtained inevitably even if there had been no statutory or constitutional violation."  *United States v. Mendez*, 315 F.3d 132, 138 (2d Cir. 2002).  Here, the evidence would been discovered in the course of an "inventory search," even absent probable cause.  This is because (a) the NYPD was within its rights to remove the car from the active roadway.  "The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge."  *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976).  And (b) given Harris's inability to drive, the NYPD was entitled to transport the vehicle to an impound lot and, once there, to conduct an inventory search.  *See United States v. Lopez*, 547 F.3d 364, 369

---

plainly justified in asking him to exit the vehicle given the indications that he was in no condition to be driving and possibly needed medical attention.  *See, e.g.*, *Sakoc v. Carlson*, No. 11-CV-290, 2012 WL 3929904, at *8 (D. Vt. Sept. 10, 2012) (officers had reasonable suspicion sufficient to justify asking driver to exit vehicle where driver's "responses to questions were delayed and evidenced some confusion," among other indicia of impairment).

(2d Cir. 2008) (An inventory search "is not done to detect crime

or to serve criminal prosecutions.  It is done for quite

different reasons: (1) to protect the owner's property while it

is in police custody; (2) to protect the police against spurious

claims of lost or stolen property; and (3) to protect the police

from potential danger.").

　　　　　To invoke the doctrine of inevitable discovery in this

context, "the government must prove three things":

> (1) that the police had legitimate custody of the
> vehicle or other property being searched, so that an
> inventory search would have been justified; (2) that
> when the police in the police agency in question
> conducted inventory searches, they did so pursuant to
> 'established' or 'standardized' procedures; and (3)
> that those inventory procedures would have
> 'inevitably' led to the 'discovery' of the challenged
> evidence.

*Mendez*, 315 F.3d at 138.

　　　　　All three requirements are met here.  First, it is

undisputed that Harris's sedan was parked in an active roadway,

which satisfies the first element.  *Opperman*, 428 U.S. at 369.

　　　　　Second, the evidence showed that NYPD officers conduct

inventory searches of vehicles regularly — as a standard

practice, and pursuant to established procedures.  Rodriguez

testified that "any time" officers "take a vehicle into

possession," they "search the vehicle for contraband, weapons,

and basically any property left within the vehicle and . . .

document any such property being discovered."  Tr. 34:23–35:3.

These inventory searches are performed pursuant to the NYPD
Patrol Guide, which officers are trained on (and which Rodriguez
had reviewed prior to the search).  Tr. 36:3–15.  A portion of
the Patrol Guide, which was introduced into evidence as
Government's Exhibit 8, directs officers to "[s]earch the
interior of the vehicle thoroughly," including "any area that
may contain valuables."  Gov't Ex. 8, at 1.

        Harris has raised no objection to the way the
inventory search of his sedan was actually conducted later that
evening, despite body camera footage of that search having been
produced and admitted into evidence.  *See* Gov't Ex. 9.

        Finally, the inventory search procedures in the NYPD's
Patrol Guide — introduced into evidence by the government —
would inevitably have resulted in officers finding the firearm.
Gov't Ex. 8, at 1.  Rodriguez testified that although the Patrol
Guide does not list fuse boxes specifically as a location to be
searched, he would search a fuse box if he thought "something
could be concealed" inside and that the tray could be opened
without damage.  Tr. 37:10–23.  This is consistent with the
Patrol Guide, which instructs officers to "[s]earch the interior
of the vehicle thoroughly," "includ[ing] any area that may
contain valuables."  Gov't Ex. 8, at 1; *see also United States
v. Miller*, No. 18-CR-395, 2019 WL 2088248, at *6 (E.D.N.Y. May

13, 2019) ("The Patrol Guide . . . describes *examples* of areas to be searched; it does not proscribe an exhaustive list.").

Indeed, officers are permitted to do even more than Rodriguez did — including to "[f]orce open [a] trunk, glove compartment, etc." if it "can be done with minimal damage" or if officers "[r]easonably suspect that the item contains weapons, explosives, hazardous materials or contraband." Gov't Ex. 8, at 1. Given that, it is permissible to open a fuse box during an inventory search. *See Miller*, 2019 WL 2088248, at *6 (opening "a fuse box that . . . was designed to and did open easily by hand . . . is fundamentally different from forcing open door panels of a vehicle that were not designed to opened easily"); *accord United States v. Zimmerman*, 480 F. Supp. 3d 446, 454–55 (E.D.N.Y. Aug. 17, 2020) (holding that a fuse box was properly subjected to an inventory search because "[t]hough not intended for that purpose, the fuse box was large enough to hide valuables, including the firearm at issue, and an inventory search is designed to ferret out such hiding places to protect both the police and the vehicle's owner in the event property is claimed to be lost.").

Thus, the search was independently justified under the inevitable discovery doctrine.

### III.  Conclusion

For the foregoing reasons, the motion to suppress is denied.

SO ORDERED.

<u>  /s/ Eric Komitee       </u>
ERIC KOMITEE
United States District Judge

Dated:    October 21, 2022
          Brooklyn, New York